William J. Paatalo –
Non-Party Witness
476 LaBrie Drive
Whitefish, MT 59937
(406) 309-1812
Bill.bpia@gmail.com

MAY 14 2026
Clerk, U.S. Courts
District of Montana
Missoula Division

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MONTANA**
**MISSOULA DIVISION**

| | |
|---|---|
| In re Subpoena to:<br><br>WILLIAM PAATALO,<br>Non-Party Movant. | Case No. 9:26-MC-00001-KLD<br><br>**NON-PARTY WILLIAM PAATALO'S OPPOSITION TO DEFENDANT'S MOTION TO COMPEL FORENSIC EXAMINATION** |

Non-Party William Paatalo, pro se, hereby submits the opposition to Defendants' Motion to Compel Forensic Examination of Electronically Stored Information and Affidavit of William Paatalo in support.

## I. OVERVIEW

Defendants seek one of the most intrusive forms of civil discovery available: compelled forensic examination of a non-party witness's private Gmail accounts and electronically stored information accumulated over approximately fourteen years of unrelated personal, professional, investigative, and litigation-related activities.

Yet Defendants identify no concrete evidence of spoliation, intentional deletion, concealed repositories, altered metadata, fabricated productions, or bad-faith destruction of electronically stored information sufficient to justify such extraordinary relief. Instead, the Motion rests largely upon speculation, disputed Gmail-thread accounting interpretations, and an increasingly expansive relevance theory untethered from the limited malpractice claims actually at issue in this litigation.

The underlying case concerns alleged malpractice arising from Defendant Steven Wilker's limited representation of Gary Koeppel during approximately 2022–2023. The operative claims involve litigation strategy, pleading decisions, causation, and handling of the underlying California matter. Nevertheless, Defendants now seek sweeping forensic access to approximately fourteen years of the undersigned's personal, professional, investigative, and litigation-related

communications accumulated through unrelated mortgage, title, creditor-identification, and litigation-support matters spanning multiple jurisdictions.

At its core, the present Motion is driven not by evidence, but by Defendants' assumption that an undisclosed AMGAR/RexNet business "enterprise" existed between Gary Koeppel and the undersigned and that additional undisclosed communications therefore "must" also exist.

The supplemental affidavit and accompanying exhibits submitted concurrently herewith materially undermine that premise and demonstrate that no such AMGAR/RexNet "enterprise" exists. The contemporaneous documents reflect that the AMGAR-related discussions involved litigation-strategy concepts associated with attorney Neil Garfield, while RexNet involved separate and unrelated technology-related concepts predating the AMGAR discussions. The productions, chronology, and contemporaneous documents already before Defendants materially contradict the narrative underlying the present Motion.

Throughout the discovery process, the undersigned repeatedly explained that Gmail stores communications in threaded conversations containing embedded reply chains and overlapping historical communications. As explained more fully below, Gmail search-result populations do not correspond to discrete standalone email files, and production accounting therefore required distinction between

Gmail-thread counts, search-result populations, exported production documents, and the underlying communications embedded within those threads.

Nevertheless, Defendants repeatedly compare fundamentally different categories of Gmail data as though they represented identical numerical datasets, thereby creating the misleading appearance of noncompliance unsupported by the actual production record.

The undersigned did not refuse to participate in discovery. To the contrary, the record reflects extensive efforts to comply with evolving discovery directives, including broad Gmail searches, staged rolling productions, Google Takeout exports, supplemental productions, accounting summaries, and sworn declarations explaining the production methodology utilized throughout the process.

Rather than identify concrete evidence of concealment or spoliation, Defendants repeatedly extrapolate conclusions from disputed Gmail-thread accounting interpretations and assumptions concerning what communications counsel believes "should" exist.

Indeed, the Motion increasingly reflects an effort to search for evidence supporting an assumed narrative rather than evidence demonstrating actual concealment, spoliation, or forensic misconduct.

## II. FACTUAL BACKGROUND

### A. The Underlying Malpractice Litigation

The underlying litigation concerns legal malpractice claims asserted by Gary Koeppel against Defendant Steven Wilker and associated counsel arising from Defendants' representation of Mr. Koeppel in connection with underlying California foreclosure-related litigation during approximately 2022–2023.
The operative claims concern alleged failures relating to litigation strategy, pleading decisions, tender-related issues, causation, and handling of the underlying foreclosure litigation.

The undersigned, William J. Paatalo, is not a party to the malpractice action, and has been falsely labeled as an "agent" of Mr. Koeppel by opposing counsel. Rather, the undersigned was identified in pretrial disclosures as a percipient witness expected to testify concerning limited factual matters associated with litigation-strategy discussions, communications involving Defendant Wilker and related counsel, tender-related discussions, and personal observations relating to Mr. Koeppel during the relevant litigation period.

During deposition examination, the undersigned clarified that he was not serving as a designated expert witness in the malpractice action.

### B. Discovery Proceedings Directed Toward the Undersigned

The present discovery dispute arises from subpoenas and subsequent discovery directives directed toward the undersigned as a non-party witness. From the outset of the discovery process, the undersigned explained that the subpoena requests and related Gmail searches implicated approximately fourteen years of personal, professional, investigative, and litigation-related communications accumulated through unrelated professional activities.

The undersigned repeatedly attempted to explain the distinction between Gmail search-result populations, Gmail-thread counts, embedded communications, production documents, and privilege-log accounting methodology throughout the discovery process. Despite those explanations, Defendant has continued to characterize the productions primarily through differing numerical comparisons and purported inconsistencies without meaningfully addressing the underlying Gmail-thread architecture, the accounting methodology utilized, or the explanations repeatedly provided regarding how embedded communications were identified, reviewed, logged, and produced.

The discovery dispute therefore progressively centered not upon concrete evidence of concealment or spoliation, but rather upon continuing disagreement concerning Gmail-thread accounting, production methodology, and Defendants'

interpretation of what additional materials they believed should exist within the electronically stored information reviewed and produced by the undersigned.

Despite concerns regarding scope, burden, confidentiality, and non-responsiveness, the undersigned undertook extensive efforts to comply with evolving discovery directives and requests, including broad Gmail searches, staged rolling productions, Google Takeout exports, supplemental productions, accounting summaries, privilege review, and manual review of Gmail-threaded communications. The resulting productions included thousands of communications and broad categories of professional materials accumulated over many years in unrelated matters.

On April 22, 2026, the undersigned submitted a Declaration of Compliance explaining the methodology utilized to identify, review, and account for Gmail-threaded communications and related productions. That Declaration explained that the productions consisted of approximately 2,696 email documents collectively representing no fewer than 7,092 underlying communications due to Gmail's embedded thread structure.

Defendants nevertheless continue to dispute the sufficiency of the productions and referenced differing numerical counts associated with Gmail

search results, Gmail-thread counts, exported production documents, embedded communications, and production batches.

### C. AMGAR and RexNet-Related Discovery Issues

During the February 24, 2026 deposition, Defendants questioned the undersigned extensively concerning AMGAR-related communications, attorney Neil Garfield, tender-related strategy discussions, communications involving Defendant Wilker, and litigation-related discussions associated with the Koeppel matter. During that examination, the undersigned testified that attorney Neil Garfield originated the AMGAR concepts and strategy and that the AMGAR-related discussions were exploratory and litigation-related in nature. The deposition testimony also addressed communications involving Defendant Wilker and discussions relating to litigation strategy associated with the underlying matter.

The deposition testimony and produced materials further reflected that RexNet involved separate technology-related concepts predating the later AMGAR-related discussions. Despite the testimony and produced documents, Defendants continue to repeatedly characterize the undersigned and Mr. Koeppel as allegedly operating a broader "mortgage/real estate/AMGAR tender business" through RexNet and related activities. As set forth in the accompanying affidavit, Defendants represented to the California court:

> "We know Mr. Koeppel is in a mortgage/real estate/AMGAR tender business with Mr. Paatalo called Rexnet. We now know another participant in this business is named Robert Steele."

Defendants further asserted in the current filings:

> "Although it is well known Mr. Paatalo and Mr. Koeppel are involved in a business called Rexnet which apparently has a business plan to sell AMGAR, Mr. Paatalo produced only two documents related to this enterprise." See Paatalo Aff. ¶¶ 38–40, Ex. D.

Notably, Defendants repeatedly frame these assertions as though the alleged AMGAR/RexNet enterprise were an established and undisputed fact, using phrases such as "we know" and "it is well known." However, the Motion identifies no competent evidentiary basis establishing the existence of any jointly operated AMGAR business enterprise between Gary Koeppel and the undersigned. To the contrary, as detailed in the accompanying affidavit and exhibits.

The undersigned respectfully submits that Defendants' repeated characterization of these matters as an established "enterprise" or "business" improperly substitutes conclusory narrative for actual evidentiary support.

## III. LEGAL STANDARD

Federal Rule of Civil Procedure 26(b)(1) limits discovery to nonprivileged matters that are relevant and proportional to the needs of the case. Courts applying

Rule 26 must actively enforce proportionality limitations and prevent discovery imposing undue burden or expense, particularly where the requested discovery seeks broad access to private electronically stored information accumulated through unrelated professional activities. See Fed. R. Civ. P. 26(b)(1); *In re Bard IVC Filters Prods. Liab. Litig.*, 317 F.R.D. 562, 564–65 (D. Ariz. 2016).

Federal Rule of Civil Procedure 45 further requires courts to protect non-parties from undue burden and expense associated with subpoenas and compelled discovery. Discovery directed toward non-parties is subject to heightened scrutiny, particularly where the requests seek extensive private electronic information unrelated to the actual claims at issue. See Fed. R. Civ. P. 45(d)(1); *Dart Indus. Co. v. Westwood Chem. Co.*, 649 F.2d 646, 649 (9th Cir. 1980).

Because Rule 45 subpoenas reach non-parties who did not choose to litigate, courts apply heightened scrutiny and must enforce Rule 45(d)(1)'s command to 'take reasonable steps to avoid imposing undue burden or expense' on subpoenaed persons. This duty is independent of the parties' interests and requires the Court to weigh the significant burden and privacy implications to a non-party against the limited additional value of the information sought

Federal courts also recognize that compelled forensic examination of private electronic accounts constitutes an extraordinary and highly intrusive form of

discovery generally requiring concrete evidence of spoliation, intentional deletion, concealment, or demonstrable discovery misconduct. Mere speculation that additional materials "must" exist is insufficient. See *John B. v. Goetz*, 531 F.3d 448, 460 (6th Cir. 2008); *Balboa Threadworks, Inc. v. Stucky*, No. 05-1157, 2006 WL 763668, at *3 (D. Kan. Mar. 24, 2006).

Courts further recognize that forensic examination inherently risks disclosure of privileged communications, confidential business information, unrelated litigation materials, and sensitive third-party data wholly unrelated to the litigation at issue. See *Ameriwood Indus., Inc. v. Liberman*, No. 4:06CV524, 2006 WL 3825291, at *4–5 (E.D. Mo. Dec. 27, 2006). Finally, discovery relevance must remain tethered to the actual claims and defenses framed by the operative pleadings. Courts routinely reject expansive discovery requests based upon speculative or attenuated relevance theories untethered from the issues genuinely presented in the litigation. See *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351–52 (1978).

## IV. ARGUMENT

### A. Defendants Seek Extraordinary Forensic Relief Against a Non-Party Without Any Evidence of Spoliation or Concealment

Forensic examination of private electronic accounts is an extraordinary remedy generally reserved for circumstances involving concrete evidence of

spoliation, intentional deletion, concealment, or demonstrable discovery abuse. See, e.g., Williams v. Massachusetts Mutual Life Ins. Co., 226 F.R.D. 144 (D. Mass. 2005) (denying forensic examination where assertions that additional emails existed amounted to speculative conjecture absent reliable evidence of concealment); Kucala Enterprises, Ltd. v. Auto Wax Co., 56 Fed. R. Serv. 3d 487 (N.D. Ill. 2003) (forensic relief associated with evidence of intentional deletion activity); Simon Property Group, L.P. v. mySimon, Inc., 194 F.R.D. 639 (S.D. Ind. 2000) (forensic imaging associated with deleted-document recovery efforts). Defendants' showing falls well short of the evidentiary basis ordinarily required to justify compelled forensic examination under Rules 26 and 45, particularly where the requested discovery bears little proportional relationship to the limited malpractice claims actually presented in this litigation.

Defendants seek one of the most intrusive forms of civil discovery available: compelled forensic examination of a non-party witness's private electronic accounts and electronically stored information accumulated over approximately fourteen years of unrelated personal, professional, investigative, and litigation-related activities.

Yet, as detailed in Sections II(B)–(C) and the accompanying affidavit, the present record contains no competent evidence of spoliation, intentional

destruction of electronically stored information, concealed repositories, altered metadata, fabricated productions, wiped devices, hidden accounts, or bad-faith deletion activity typically associated with compelled forensic examination. Instead, the Motion rests largely upon disagreement concerning Gmail-thread accounting methodology, speculation regarding what communications Defendants believe "should" exist, and increasingly expansive assumptions arising from Defendants' evolving AMGAR/RexNet "enterprise" theory.

The undersigned repeatedly explained throughout the discovery process that Gmail stores communications in threaded conversations containing embedded reply chains and overlapping historical communications. As reflected in the Declaration of Compliance and related accounting summaries, Gmail search-result populations do not correspond to discrete standalone email files, and the production process therefore required distinction between Gmail-thread counts, search-result populations, exported production documents, and the underlying communications embedded within those threads.

Defendants nevertheless continue to compare fundamentally different categories of Gmail data as though they represented identical numerical datasets, thereby creating the misleading appearance of noncompliance unsupported by the actual production record.

Importantly, the undersigned did not merely produce documents without explanation. Rather, as detailed throughout the record, the undersigned conducted broad Gmail searches, produced staged rolling productions, generated Google Takeout exports, manually reviewed Gmail-threaded communications, provided accounting summaries, submitted sworn declarations explaining methodology, and supplemented productions throughout the discovery process.

The April 22, 2026 Declaration of Compliance specifically explained that the resulting productions consisted of approximately 2,696 email documents collectively representing no fewer than 7,092 underlying communications due to Gmail's embedded thread structure. Defendants do not meaningfully rebut that explanation with contrary forensic evidence. Nor do Defendants identify any actual forensic indicators ordinarily associated with compelled forensic review, such as deleted repositories, wiped devices, altered metadata, fabricated productions, concealed accounts, or evidence of intentional deletion activity.

Instead, Defendants repeatedly speculate that additional communications "must" exist based largely upon assumptions concerning the quantity of expected communications, the undersigned's broader professional background, and Defendants' evolving AMGAR/RexNet narrative. But speculation concerning what opposing counsel believes "should" exist is insufficient to justify compelled

forensic examination of a non-party witness's private electronic accounts. See Williams v. Massachusetts Mutual Life Ins. Co., 226 F.R.D. 144 (D. Mass. 2005).

As detailed in the accompanying affidavit and exhibits, the evidentiary record now materially undermines the factual premise underlying Defendants' expanding "enterprise" theory. The contemporaneous documents reflect litigation-strategy discussions associated with attorney Neil Garfield, creditor-identification and title-related concerns associated with the Koeppel matter, and separate RexNet-related technology concepts predating the later AMGAR discussions. The record therefore does not support the inference that extensive categories of supposedly "missing" enterprise-related communications necessarily exist within the undersigned's electronic records.

The present dispute increasingly presents a question not of concealment or spoliation, but whether the assumptions and factual inferences advanced in support of forensic examination are themselves supported by the actual evidentiary record developed during discovery.

Defendants also attempt to rely upon statements arising from the May 5, 2026 California sanctions proceedings to imply that the California court somehow found the existence of a concealed AMGAR or RexNet commercial enterprise jointly operated by the undersigned and Mr. Koeppel. The transcript does not

support that characterization. As reflected in the transcript itself, the California proceedings centered primarily upon discovery disputes, production timing, privilege-review issues, Gmail-thread accounting disputes, and sanctions-related concerns associated with the ongoing production process.

At no point did the California court conduct an evidentiary hearing or make factual findings establishing a concealed AMGAR enterprise, a RexNet foreclosure operation, a jointly operated tender business, or coordinated commercial conduct.

Defendants now improperly attempt to transform sanctions-related procedural commentary concerning litigation coordination into supposed proof of a broader commercial "enterprise" theory not established by the actual record. Importantly, Defendants also elected not to meaningfully confer regarding the Gmail-thread accounting issues before filing the present Motion despite simultaneously asserting that further conferral would purportedly be "futile." As reflected by the supplemental affidavit and accompanying exhibits, meaningful conferral regarding the Gmail architecture, production methodology, and factual assumptions underlying the Motion could have substantially narrowed or clarified many of the issues now presented to the Court.

Ultimately, Defendants seek forensic examination not because concrete evidence of concealment or spoliation exists, but because Defendants remain

dissatisfied with the evidentiary support for an increasingly expansive narrative developed throughout the discovery process itself. That showing falls well short of the concrete evidentiary basis ordinarily required to justify compelled forensic examination under Rules 26 and 45.

### B. The Requested Discovery Is Grossly Disproportionate to the Limited Claims at Issue

Even apart from the absence of evidence supporting spoliation or concealment, the extraordinary discovery sought by Defendants is grossly disproportionate to the actual claims and defenses presented in the underlying malpractice litigation.

The operative malpractice claims concern Defendant Wilker's limited representation of Gary Koeppel during approximately 2022–2023 and involve allegations relating to litigation strategy, pleading decisions, tender-related issues, causation, and alleged damages arising from that representation.

Against that backdrop, Defendants now seek effectively unrestricted forensic access to approximately fourteen years of the undersigned's Gmail communications, declaration-related materials, investigative records, unrelated litigation materials, confidential business-development discussions, proprietary investigative work product, and broad categories of electronically stored

information accumulated through unrelated professional activities across multiple jurisdictions.

As detailed in the factual record, Defendants demanded broad categories of "executed declarations" spanning approximately a decade of the undersigned's investigative and litigation-related activities involving numerous unrelated matters throughout the United States. The broad Gmail-search-result populations and extensive productions now complained of by Defendants were therefore a direct and foreseeable consequence of the breadth of the requests themselves.

The undersigned attempted to explain that Gmail search functionality returns expansive threaded-conversation populations rather than isolated standalone communications and that broad search terminology concerning declarations and litigation materials would necessarily capture substantial quantities of unrelated and embedded communications accumulated over many years.

Defendants nevertheless now characterize those same productions — including materials produced in response to Request No. 14 — as purported evidence of "obfuscation," "inflation," or misconduct supporting forensic examination. Many of the present disputes were compounded by the absence of any meaningful narrowing of scope throughout the conferral process.

As reflected throughout the discovery proceedings, Defendants consistently maintained an effectively unlimited relevance position concerning broad categories of Gmail-thread communications, declaration-related materials, historical litigation communications, and electronically stored information accumulated through many years of unrelated professional activities.

Although the undersigned repeatedly attempted to explain the breadth of the Gmail-thread populations being captured and the substantial quantities of unrelated material swept into those search populations, the conferral process did not meaningfully narrow the categories of information Defendants continued to demand. Instead, the discovery process increasingly proceeded from the assumption that virtually all communications touching upon mortgage-related subject matter, declarations, litigation discussions, AMGAR references, RexNet references, or related professional activities were broadly discoverable regardless of their relationship to the limited malpractice claims actually at issue.

The resulting burdens, accounting complications, Gmail-thread population disputes, and expansive productions now complained of by Defendants were therefore substantially driven by the breadth of the discovery demands themselves and the absence of meaningful scope limitation during the conferral process.

The undersigned's profession as a licensed private investigator and litigation consultant necessarily involves extensive communications relating to unrelated clients, investigations, litigation activities, and professional engagements throughout the United States. But longstanding professional involvement in mortgage and creditor-identification matters does not render every communication, declaration, investigative file, or litigation-related discussion accumulated over more than a decade discoverable in this malpractice action.

Nor does it justify compelled forensic examination of a non-party witness's private electronic accounts where the overwhelming majority of such materials concern unrelated matters having no meaningful connection to the claims asserted against Defendant Wilker.

The cumulative burden imposed by the ongoing discovery disputes has also become extraordinary. As reflected in the record, the undersigned has expended substantial time responding to evolving discovery directives, conducting Gmail searches, reviewing threaded communications, preparing supplemental productions, generating exports, preparing declarations, responding to repeated motions practice, and traveling in connection with contempt-related proceedings arising from the discovery disputes.

The undersigned's electronic accounts necessarily contain attorney-client communications, unrelated client matters, investigative work product, proprietary analyses, personal family communications, and commercially sensitive information associated with matters wholly unrelated to the Koeppel litigation. The requested forensic review would therefore expose extensive confidential third-party materials far beyond any legitimate discovery needs associated with the limited malpractice claims at issue here.

Importantly, the present record still contains no concrete evidence that the undersigned destroyed evidence, concealed responsive materials, fabricated productions, altered metadata, or otherwise engaged in bad-faith noncompliance.

To the contrary, the record reflects extensive productions, supplemental disclosures, sworn explanations, accounting summaries, and substantial efforts to comply with evolving discovery directives despite the extraordinary burden imposed.

Rules 26 and 45 do not authorize limitless exploratory discovery untethered from the actual claims and defenses presented in the litigation, nor do they permit compelled forensic examination of a non-party witness's private electronic accounts based merely upon speculation that additional communications "should" exist.

## V. CONCLUSION

Defendants built an escalating forensic and sanctions narrative upon the assumption that a concealed AMGAR/RexNet enterprise exists and that undisclosed communications therefore "must" also exist. The contemporaneous documents, affidavit, and evidentiary record now before the Court materially undermine that premise.

Forensic examination is not intended as an exploratory mechanism to search for evidence supporting a speculative premise or to compel a non-party witness to somehow prove the nonexistence of additional materials that opposing counsel assumes should exist. Such extraordinary relief is generally reserved for circumstances involving actual evidence of spoliation, intentional deletion, concealment, altered metadata, fabricated productions, or demonstrable forensic misconduct. The present record contains no such evidence.

Instead, the requested forensic examination would expose approximately fourteen years of electronic records accumulated through the undersigned's unrelated professional, investigative, consulting, litigation-support, and personal activities across numerous matters, jurisdictions, clients, and communications extending far beyond the limited malpractice claims at issue in this case.

As reflected throughout the discovery record, the breadth of the subpoena requests and Gmail-search-result populations necessarily swept in extensive categories of historical and third-party materials, including unrelated client communications, investigative work product, personal communications, embedded Gmail-thread chains, litigation-support materials, and electronically stored information associated with matters having no substantive connection to the claims asserted against Defendant Wilker. The undersigned does not raise these concerns to relitigate prior responsiveness determinations made during the discovery process, but rather to emphasize the extraordinary scope, intrusiveness, and proportionality concerns implicated by the compelled forensic examination now sought by Defendants.

Rules 26 and 45 were specifically designed to prevent precisely this type of disproportionate, speculative, and unnecessarily intrusive discovery directed toward a non-party witness absent a concrete evidentiary basis demonstrating actual concealment or spoliation.

Accordingly, the undersigned respectfully requests that the Court deny Defendants' Motion to Compel Forensic Examination in its entirety and grant such further relief as the Court deems just and proper.

Dated: May 13, 2026

William Paatalo – Non-Party, Movant

## CERTIFICATE OF SERVICE

I certify that on the 13th day of May, 2026, I served a true and correct copy of the foregoing **NON-PARTY WILLIAM PAATALO'S OPPOSITION TO DEFENDANT'S MOTION TO COMPEL FORENSIC EXAMINATION & AFFIDAVIT OF WILLIAM PAATALO IN SUPPORT** by electronic mail to the following:

JESSICA R. MACGREGOR, Bar No. 168777
JOHN B. SULLIVAN, Bar No. 238306
ABIGAIL W. HENDERSON, Bar No. 338358
LONG & LEVIT LLP
465 California Street, Suite 500
San Francisco, California 94104
Telephone: (415) 397-2222
Facsimile: (415) 397-6392
Email: jmacgregor@longlevit.com
jsullivan@longlevit.com
ahenderson@longlevit.com

RONALD H. FRESHMAN (SBN 225136)
LAW OFFICES OF RONALD H. FRESHMAN
3040 Skycrest Drive
Fallbrook, California 92028
Telephone: (858) 756-8288
Facsimile: (858) 964-1728
Email: rhf@freshmanlaw.com

Date: May 13, 2026

William Paatalo, Pro Se
Non-Party Movant