# EXHIBIT A

Gmail                                                    Bill Paatalo <bill.bpia@gmail.com>

---

## Re: AMGAR Conference Call: Wednesday, June 7 at 11:00 AM PDT

1 message

---

**Bill Paatalo** <bill.bpia@gmail.com>    Mon, Jun 5, 2023 at 12:38 PM
To: Gary Koeppel <gary@coastgalleries.com>, Neil Garfield <neilfgarfieldesq@gmail.com>
Cc: "Wilker, Esq. Steven" <steven.wilker@tonkon.com>, Paul Balmer <Paul.Balmer@tonkon.com>, Schleining John <becky@schleining.com>, Cromwell Kimberly <ksc@freshmanlaw.com>, Koeppel Gary <gkoeppel@icloud.com>

william paatalo is inviting you to a scheduled Zoom meeting.

Topic: AMGAR Strategy - Koeppel Case
Time: Jun 7, 2023 12:00 PM Mountain Time (US and Canada)

Join Zoom Meeting
https://us02web.zoom.us/j/85682639436?pwd=OEZXVkhNcTlvaEl1MGZtVW9hS1lqZz09

Meeting ID: 856 8263 9436
Passcode: 531219

---

One tap mobile
+12532050468,,85682639436#,,,,*531219# US
+12532158782,,85682639436#,,,,*531219# US (Tacoma)

---

Dial by your location
• +1 253 205 0468 US
• +1 253 215 8782 US (Tacoma)
• +1 346 248 7799 US (Houston)
• +1 669 444 9171 US
• +1 669 900 6833 US (San Jose)
• +1 719 359 4580 US
• +1 309 205 3325 US
• +1 312 626 6799 US (Chicago)
• +1 360 209 5623 US
• +1 386 347 5053 US
• +1 507 473 4847 US
• +1 564 217 2000 US
• +1 646 931 3860 US
• +1 689 278 1000 US
• +1 929 205 6099 US (New York)
• +1 301 715 8592 US (Washington DC)
• +1 305 224 1968 US

Meeting ID: 856 8263 9436
Passcode: 531219

Find your local number: https://us02web.zoom.us/u/kQrBs4pj

On Mon, Jun 5, 2023 at 12:20 PM Gary Koeppel <gary@coastgalleries.com> wrote:

> Gentlemen,
>
> Everyone is confirmed for the conference call regarding AMGAR on Wednesday at 11:00 PDT.
>
> Thank you,

**M Gmail** **Bill Paatalo <bill.bpia@gmail.com>**

---

## RE: AMGAR Zoom Outline 4 Today - Koeppel Case

1 message

---

**Steven Wilker** <steven.wilker@tonkon.com> Wed, Jun 7, 2023 at 11:37 AM
To: Bill Paatalo <bill.bpia@gmail.com>, Neil Garfield <neilfgarfieldesq@gmail.com>
Cc: Becky Bailey <becky@schleining.com>, "Kimberly S. Cromwell" <ksc@freshmanlaw.com>, Paul Balmer <Paul.Balmer@tonkon.com>, Gary Koeppel <gary@coastgalleries.com>, Cathy Schleining <cathy@schleining.com>

My court conference started late. I may be a few minutes late to the Zoom.

**Steven Wilker | Tonkon Torp LLP**
Partner / Co-Chair, Litigation Department
503.802.2040 direct
steven.wilker@tonkon.com

**From:** Bill Paatalo <bill.bpia@gmail.com>
**Sent:** Wednesday, June 7, 2023 8:48 AM
**To:** Neil Garfield <neilfgarfieldesq@gmail.com>
**Cc:** Steven Wilker <steven.wilker@tonkon.com>; Becky Bailey <becky@schleining.com>; Kimberly S. Cromwell <ksc@freshmanlaw.com>; Paul Balmer <Paul.Balmer@tonkon.com>; Gary Koeppel <gary@coastgalleries.com>; Cathy Schleining <cathy@schleining.com>
**Subject:** AMGAR Zoom Outline 4 Today - Koeppel Case

Hi Neil,

Here is a brief list of what we will likely be discussing today.

You have the complaint I sent which outlines the historical facts. Gary Koeppel came to me in 2011-2012 in a non-default situation wanting to know if his Deed and Note had issues to be concerned about. Like the Humphreys case in TN, we embarked on a mission to find out who owned the debt and original note, etc. In over 10 years, we have never been provided with this information, administratively through QWR's and through Federal Court discovery efforts. Responses have all been inconsistent with numerous conflicting chains of title. This was undoubtedly ensnarled in the Lehman bankruptcy. You know the drill. They don't have the goods. Currently, we have multiple versions of the Note pre-2018 with no endorsements, and then an inspected version in 2019 with endorsements that is a computer-generated forgery after inspection.

We know going into an AMGAR strategy that Nationstar cannot meet the conditions made by a third-party investor in a tender offer. Any efforts attempting to do so would likely conflict with their past statements and facts already provided. So some of the questions the team will be seeking today are as follows:

1. Can you provide details on how the process works, or has specifically worked, in the 3 CA cases you handled?

2. Based on the factual history and your experience, how confident are YOU that Nationstar in this matter cannot perform on the tender conditions as the alleged servicing agent for Wells Fargo Trustee for SARM 2005-20 trust?

3. Can the tender funds be made as a commitment letter from a financial institution, through the investor's counsel, rather than having the $1.8m cash put into an escrow account? (i.e. Investor using his personal credit line to make the offer.)

4. What is the typical expiration date on the tender offer, and what happens if Nationstar does not perform satisfactorily and the offer is removed? Would Gary have new claims?

5. In a worst-case scenario where Nationstar believes it can meet all conditions, does the investor have an "escape hatch" if he is not convinced or satisfied that the Note is not an original? After all, it is in dispute and it would be a he said / she said situation. In the 16 cases you have done with this strategy, have you ever encountered this situation before? And finally (on my list),

6. Could Gary decide to simply reinstate for roughly $600k at any time during the process?

Thanks for joining us today, Neil.

Sincerely,

Bill

--

Bill Paatalo
Oregon Private Investigator - PSID#49411

BP Investigative Agency, LLC
Mailing Address:

476 LaBrie Drive

Whitefish, MT 59937

Office: 1-(888)-582-0961

bill.bpia@gmail.com

www.bpinvestigativeagency.com

*TO PLACE AN ORDER CLICK ONE OF THE FOLLOWING LINKS*:

**New - Preliminary Analysis & Zoom Conference - $595.00:**

https://bpia.wufoo.com/forms/r1hkczdp1ge2xtc/

# EXHIBIT B

Gmail

Bill Paatalo <bill.bpia@gmail.com>

## Confidential source materials, attorney client privileged, proprietary

1 message

**Neil Garfield** <neilfgarfieldesq@gmail.com> Fri, Jun 9, 2023 at 2:09 PM
To: Bill Paatalo <bill.bpia@gmail.com>

see attached. DO not share without editing out personal information.

If you are putting together a business venture (not a one-off deal) then you might want to contact Robert (Bob) Needham, who possesses exceptional skills and is familiar with the project. He has run dozens of successful start-ups.

ROBERT NEEDHAM
Robert A. Needham, JD
President
**SPECTRUM** Advanced Markets, Inc.
Office: 205-578-7208
Cell: 205-567-1266
skype robert_needham

**see attached**

**See aslo:**
I am reaching out to your organization because of the recent media attention to Mr. Ross. His reputation for looking at profit opportunities in the face of apparent failures suggests that your organization might have an interest in a plan I devised for the Arizona State legislature when I resided in Tucson and Phoenix 2004-2012.

This is a summary of the plan, which requires my organization to succeed:

1. Approximately 8 million residential foreclosures will be initiated or completed over the next 5-8 years. 96% of those represent "loan contracts" subject to false claims of securitization. The percentage is a projection corroborated by me in Courts across the country.
2. The judicial climate is hostile to homeowners, generally speaking.
3. The plan I proposed (AMGAR) was accepted by the Arizona legislature and that was confirmed by the Governor's office as bringing in more than $3 Billion in revenue that would have eliminated the state deficit caused by the mortgage meltdown. Eventually the plan went dark because of intervention from Senator McCain.

4. AMGAR has been adapted for use by private investors and proof of concept has occurred with 16 situations where property owners had resources to offer the full amount demanded by "pretender lenders.". I was involved in all of those situations. In addition, I have received reports (as editor of the largest information source on securitization of residential mortgage" debt) of dozens of other instances where the plan was successfully concluded with my assistance.

5. In short the plan is simple: an investor entity issues a bona fide irrevocable letter of commitment for an amount equal to the total known monetary demand by the foreclosing entity. The case must be in litigation at this point in order to facilitate the plan.

6. The offer is contingent upon only one prerequisite that is exactly the same as industry standard in the banking industry, to wit: that the creditor be identified with certainty, including such proof as is demanded by the issuer of the commitment, to wit: a wire transfer receipt or canceled check.
7. State laws in all 50 states require any "creditor" to accept payment in full and issue the satisfaction and release of the mortgage and note.
8. In all instances where I have been directly involved and all other reported instances, without exception, the attorney for the foreclosing party refused payment and later argued to the court that they were not required to accept payment if they elected foreclosure as the remedy. In all cases even the most bank biased judges rejected that argument as absurd. In all cases, except 1, the case was settled under seal of confidentiality to the extreme satisfaction of the homeowner, sometimes including six figures in damages and full payment of attorney fees.
9. Enter the investor who enters into a risk sharing agreement with the homeowner. My organization will facilitate that process.

10. If the project is unsuccessful in the sense that intense litigation is required, the commitment expires by time and preconditions. That has not happened yet. There generally would be no risk of loss because the money in escrow posted by the investor would never have been issued or released. Thus an infinite return on an investment that is never released except for expenses that would not exceed 5% of the funded commitment..
11. If the project is unsuccessful in the sense that the foreclosing party in fact produces ownership of the debt and not just the apparent ownership of the paper (note and mortgage), then the investor loses money. The amount of money lost is the difference between the fair value of the property and the higher amount demanded by the foreclosing party.
12. If the project is partly successful (settlement and modification of loan), the investor receives a substantial fee as compensation for the risk undertaken in the commitment. This is a secured by a secondary lien on the property of the homeowner. There generally would be no risk of loss because the money in escrow posted by the investor would never have been issued or released. Thus an infinite return on an investment that is never released except for expenses that would not exceed 5% of the funded commitment..
13. If the project is entirely successful --- an event that frequently occurs --- the homeowner receives a satisfaction of mortgage, release of the canceled note, plus economic damages and payment of attorney fees. The property is thence released from any encumbrance. This the goal of each project. The investor receives a new mortgage with 1st lien priority securing payment of a promissory note paying the fee for the risk sharing agreement in the amount of 30%-35% of the original "loan" that was securitized. There would be no risk of loss because the money in escrow posted by the investor would never have been issued or released. Thus an infinite return on an investment that is never released except for expenses that would not exceed 5% of the funded commitment..
14. The plan works because securitization was a false claim. Underwriters created Trusts on paper that were never used for anything and rented the name of brand name banks to pose as Trustees. The commitment would only issue in cases where this context is obvious. The low hanging fruit amounts to hundreds of billions of dollars in alleged "loan contract" that actually don't exist.

15. The foreclosing parties cannot emerge with a creditor (a) because the creditor consists of an unnamed and unincorporated undifferentiated commingled dynamic dark pool in which it is either not possible to ascertain the actual parties whose money was used to originate loans (instead of acquiring them as per prospectus and PSA issued by the paper trust) OR (b) they choose not to disclose the composition of creditors because to do so would be an admission that they violated the terms of the offering, failed to deliver proceeds of sale of MBS to the Trust and committed fraud upon the fund managers who advanced stable managed funds for the purchase of MBS certificates issued by the empty Trust.
16. Thus the establishment of an escrow where several offers could be made during the same period, would eventually become self funding providing an infinite return on an investment that constitutes 95% of the money invested posted and remaining in escrow, never to be released.
17. While it is possible for others to perform the details of the tasks required to successfully test and launch this program, ultimately on trillions of dollars of loans, I alone have 2 million readers who already trust and hope for the launch of the AMGAR program and since it is my invention for which I claim intellectual rights and control, only I can provide the necessary context and ingredients for the plan to succeed. If I endorse the plan, it will go viral.

If you are interested in pursuing this, I can show you in verifiable form, the reason why this program would return potentially hundreds of billions in profits based on the current foreclosure projections and a modest investment.
Regards,
Neil F Garfield

see also:
Relating to the email dated 1/6/17

1. American Properties Group is the Parent Company of Bonita Springs Holdings, a Florida LLC

2. Bonita Springs Holdings, a Florida LLC is the client

3. Name of homeowner is Hugo
4. Attorney for the homeowner should have substantial courtroom experience. We have a lawyer in Ft. Lauderdale, but if you have a local attorney that will be fine as long as he/she is on board with our strategy.
5. We represent Bonita Springs Holdings, a Florida LLC and not the homeowner.
6. Licensing as lender or broker should be considered if after the first pilot client elects to proceed with other properties
7. Other properties will be in Florida. This will make due diligence and underwriting easier to determine the ability of the homeowner to pay off the debt incurred as the AMGAR risk sharing fee, probably secured by mortgage which should not exceed 80% LTV

8. Unclear as to whether client intends to make an offering to third party investors. If YES, then discussion should ensue as to whether the investors are related entities or if they are third party investors seeking a passive return on their investment which would then be considered a security. As such it would be regulated by SEC laws and rules. This does not need to be taken into account on the first deal unless some offering has occurred or will occur with respect to the first pilot case.
9. 9. Correction; reference to FS §704 should have been FS §701.04

701.04 Cancellation of mortgages, liens, and judgments.—

**(1) Within 14 days after receipt of the written request of a mortgagor, a record title owner of the property, a fiduciary or trustee lawfully acting on behalf of a record title owner, or any other person lawfully authorized to act on behalf of a mortgagor or record title owner of the property, the holder of a mortgage shall deliver or cause the servicer of the mortgage to deliver to the person making the request at a place designated in the written request an estoppel letter setting forth the unpaid balance of the loan secured by the mortgage.**

**(a) If the mortgagor, or any person lawfully authorized to act on behalf of the mortgagor, makes the request, the estoppel letter must include an itemization of the principal, interest, and any other charges properly due under or secured by the mortgage and interest on a per-day basis for the unpaid balance.**

**(b) If a record title owner of the property, or any person lawfully authorized to act on behalf of a mortgagor or record title owner of the property, makes the request:**

**1. The request must include a copy of the instrument showing title in the property or lawful authorization.**

**2. The estoppel letter may include the itemization of information required under paragraph (a), but must at a minimum include the total unpaid balance due under or secured by the mortgage on a per-day basis.**

3. The mortgagee or servicer of the mortgagee acting in accordance with a request in substantial compliance with this paragraph is expressly discharged from any obligation or liability to any person on account of the release of the requested information, other than the obligation to comply with the terms of the estoppel letter.

(c) A mortgage holder may provide the financial information required under this subsection to a person authorized under this subsection to request the financial information notwithstanding s. 655.059.

(2) Whenever the amount of money due on any mortgage, lien, or judgment has been fully paid to the person or party entitled to the payment thereof, the mortgagee, creditor, or assignee, or the attorney of record in the case of a judgment, to whom the payment was made, shall execute in writing an instrument acknowledging satisfaction of the mortgage, lien, or judgment and have the instrument acknowledged, or proven, and duly entered in the official records of the proper county. **Within 60 days after the date of receipt of the full payment of the mortgage, lien, or judgment, the person required to acknowledge satisfaction of the mortgage, lien, or judgment shall send or cause to be sent the recorded satisfaction to the person who has made the full payment. In the case of a civil action arising out of this section, the prevailing party is entitled to attorney fees and costs.**

**(3) Whenever a writ of execution has been issued, docketed, and indexed with a sheriff and the judgment upon which it was issued has been fully paid, it is the responsibility of the party receiving payment to request, in writing, addressed to the sheriff, return of the writ of execution as fully satisfied.**

**See also:**

Date of Commitment: ___ day of _______, 2014.

Expiration Date of Commitment: 90 calendar days from date of commitment. This commitment may not be extended, modified, altered or modified in any respect without express written authorization of AMGAR.

Escrow or Court Registry: Upon Expiration of this Commitment, the funds shall be payable immediately to AMGAR upon ex parte court order without any liability applicable to the holder of the funds. If the estoppel and commitment terms are met, the Borrower shall receive an authorization from AMGAR to release the funds to the appropriate creditor. If said authorization is not provided within 10 days of written demand, then any party may apply to the Court for disbursement of the funds provided that each and every term, condition and provision of this Commitment has been entirely fulfilled. There is no intent by AMGAR to allow any construction of events to be a "material" fulfillment of the terms, conditions and provisions inasmuch as the condition precedent to release of funds must be actual complete satisfaction of the terms, conditions and provisions of this Commitment.

EARLY EXPIRATION OF COMMITMENT: In the event any court of law enters an order in which the court confers upon itself discretionary authority to determine whether the commitment has been totally satisfied as to all of its terms, conditions and provisions, then the commitment shall expire at the same moment as such order is entered by any court. In such event the funds held in the Court Registry, or in any escrow account shall be immediately disbursed back to AMGAR.

Risk Sharing Agreement: This commitment is predicated upon the execution of a valid, enforceable risk sharing agreement, executed in 2 or more counterparts, each of which shall be considered an original. In the event that the borrower obtains clear title to the subject property without the encumbrance of the existing mortgage nor any other equivalent encumbrance — such that the mortgage contemplated in the the risk sharing agreement from Homeowner to AMGAR would have first priority over all other encumbrances deriving their value from a loan of money, then the terms of this commitment letter shall be deemed expired, the money held in the Court registry or other agreed escrow account disbursed back to AMGAR, and the commitment of Homeowner and AMGAR will control subsequent events.

To: Homeowner, residing in the property as the primary residence and domicile of the Borrower.

Amount of Commitment:

Type of Loan: Refinancing, risk sharing and equity participation

AMGAR will pay the creditor any amount up to the amount stated in this commitment, provided the terms and conditions of the commitment are met in their entirety, each one being a material condition precedent to funding.

The actual amount paid will be computed by reference to the terms and conditions expressed in this commitment. The money shall be paid out of a court Registry or an agreed trust or escrow account.

Subject to the terms of this Commitment, the party paid will be the actual current creditor who is owed the money that was advanced as a loan to the borrower on or about the ___ day of ____, _____. This party is described herein as the party(ies) whose books and records describe an account receivable deriving its value strictly from the advance of funds on the above-referenced closing date, as received by or on behalf of the Borrower.

The maximum amount paid will be the amount demanded in a court of law during the pendency of a foreclosure action against the borrower or the amount shown as account receivable on the books of the actual creditor, whichever is lower. At present the estimated amount of this demand is $_______________.

The actual amount paid, shall be the maximum amount to be paid as described above less borrower or third party payments received by or on behalf of the creditor. The actual amount paid shall be increased by advances made by or on behalf of the creditor to the borrower or expenses paid by the creditor relating to preserving the creditor's interest in the debt.

Neither the Promissory Note nor the Mortgage Deed shall be considered dispositive of the issue of ownership or balance of the debt. Nor shall the books and records of a servicer be considered dispositive of the issue of ownership of the debt or balance of the debt. Nor shall the settlement statements or other instruments executed by Borrower at the "closing" of a loan be dispositive of the issues of ownership of the debt or balance due.

This commitment may only be satisfied by actual proof of the transfer of money from one party to another and shall not be construed by any person or Court to include any assumptions or presumptions that might apply with respect to enforcement of any prior instruments executed by the Borrower nor any instruments executed by any party as endorser, assignee, endorsee, assignor, transferor, power of attorney or any other similar document that purports to relate to the debt created by operation of law on the above-described date with respect to the purported note and purported mortgage described in this instrument originating from the "closing" on said date with respect to the original debt described above.

Specifically, this terms of this Commitment shall not be construed as being governed by any law, rule, assumption or presumption as to the legal status of any entity as holder, holder in due course or otherwise having possession or claiming any rights to the debt by virtue of a written instrument.

AMGAR's intent is to pay the creditor and only the creditor — i.e., the party who would suffer financial loss by having an unpaid legitimate claim for an account receivable from the borrower, regardless of privity of contract.

Borrower must obtain, pursuant to the requirements of Florida Statute 701.04, an estoppel letter answering the the specific facts expressed in said statute and the specific facts expressed in the remaining terms of this commitment, or clear title from a court of competent jurisdiction removing the existing mortgage encumbrances.

This commitment is not applicable to any situation in which AMGAR receives anything other than a first priority title position as the only lender to the Borrower receiving a mortgage deed as collateral for the loan commitment and assumption of risk by AMGAR. This means that a satisfaction and release must be received in accordance with the following terms and conditions by all parties claiming any interest or rights of enforcement of the debt, note or mortgage executed on the above date and recorded in the public records of the County in which the property is located at page ___ Book ___.

Homeowner/Borrower must produce from the party claiming an existing lien (a) an estoppel letter from the actual existing creditor or lender as per the terms of this commitment and Florida Statute 701.04 (b) proof of ownership of the putative loan, including the debt at law, and both note and mortgage and (c) the net balance due to the actual creditor after deductions for all payments received by or on behalf of the creditor such that the receivable account of the creditor allocated or attributed to the putative loan have been deducted. Any other offsets for damages will not be considered deductions from said receivable unless the Homeowner/Borrower and the party bringing the claim of foreclosure agree to a settlement based upon a reduction of the amount due in lieu of recovery of damages through payment. AMGAR shall be entitled to recover such money as is advanced under the Risk Sharing Agreement in the event that the Court awards recovery of attorney fees, costs and/or expenses associated with the case (in the event of a successful outcome of litigation in favor of the Homeowner/Borrower).

In order to obtain proof of ownership and proof of balance, AMGAR shall only accept for purposes of this Commitment and the Risk Sharing Agreement, ONLY the following:

- The name of the actual Creditor, together with contact information to a person who can confirm the information provided is correct.
- The date on which the Creditor paid for the acquisition or origination of the subject debt.

- If the creditor originated the loan, produce a copy of the canceled check or wire transfer receipt or other proof of value paid by the creditor, excluding warehouse lending, table funded sources, or fourth party sources of funding for the origination of the loan.
- If the creditor did not originate the loan, then the same information must be produced from the party claiming to have originated the subject loan plus the date and terms of sale of the loan, including parties, which must include contact persons with whom the transaction can be confirmed.
- A statement from the named Creditor (regardless of whether it is the named party claiming rights to enforce the debt, note or mortgage claimed in the foreclosure action), that the creditor is holding an account receivable attributable or allocable to the subject loan in litigation, including the amount due, per diem interest, and any other amounts advanced by the creditor or on behalf of the creditor under circumstances where the creditor is obliged to reimburse the amounts advanced by third parties.

1. (Yes or no): Has the Creditor ever directly (by reference to the subject loan) or indirectly (as part of an asset class) reported the subject loan as a receivable or as an allocable share of a receivable in a required or requested form to the public or any Federal Agency or state agency? Please attach said report.
   - If the answer to the preceding question is yes, then please identify the filing or report by the Bank with sufficient specificity that it easily could be produced upon request, including the date of the instrument, the name or heading of the filing or report, and the person responsible for said report.
2. A statement from the Creditor as to whether the ownership of the receivable in the subject loan is direct (posted as account or loan receivable) or indirect (posted as ownership through value derived from an instrument other than the note , as for example, a mortgage-backed bond or a hedge position --- including insurance and guarantees --- deriving its value from a bond or note).
3. If ownership of the debt is based upon an instrument deriving its value from the note and mortgage subject to this Commitment for refinancing, a statement from the creditor as to the date of acquisition of such instrument, the documentation for the acquisition, including the proof of payment (wire transfer receipt, wire transfer instructions, canceled check or other proof of payment of money in exchange for either the instrument or the subject debt, note and mortgage.
4. If ownership of the debt is based upon an instrument deriving its value from the note and mortgage subject to this Commitment for refinancing, a statement from the creditor as to the names and contact information of other parties (Third parties) who were involved in any of the following: (a) their role in the origination or acquisition of the subject debt, note and/or mortgage (b) any value or money received related to the origination or acquisition (c) any agreements governing their roles.
5. If Third parties received such money or value, whether such money or value was paid, or part of any settlement of claims between the Creditor and such Third parties.
6. If Third parties received such money or value and not paid to the Creditor, a statement from the Creditor as to whether such money is being held by a Third party for the benefit of the Creditor.
7. If the Third parties received such money or value, whether the receipt of such money, directly or indirectly by or on behalf of the Creditor, was used to reduce the amount of the Creditor's receivable from any party related to the instrument deriving its value from the subject loan either directly or indirectly.
8. A statement from the Creditor stating the value of such receipts attributable directly or indirectly to the subject loan.
9. A statement from the Creditor as to whether Creditor any party reported, claimed or declared a loss on the subject debt, note or mortgage, or derivative instrument (as defined above), and if so, the amount of the loss and the dates such claim, declaration or report was filed or sent.
10. A statement from the Creditor stating whether any payment of money or value was paid by any private or public entity and if so, the dates of such payments and the treatment of such payments as credits, reduction of the Creditor's receivable account as described above, and whether any part of such receipt was allocated to the balance due from the Homeowner/ Borrower.
11. If the Creditor states that it does not know whether such payments were made as described in the preceding paragraphs, then a statement from the Creditor as to what party would have that information including the contact information of the person with whom that information can be confirmed.
12. If the Creditor states or knows that money was received by Third parties, a statement from the Creditor as to the allocatable portion of such payments to the account receivable deriving its value from the subject loan.
13. A statement from the Creditor or authorized third party with particularity the amount of the payment, value or money received in relation to the debt, note, mortgage or derivative instrument described above, the dates on which each payment was made, the payor (together with contact information of the person responsible for making such payment such that a subpoena could be properly served) and the method of allocation (if any allocation was made) of such payment to the account receivable balance or such other account that the Creditor or its identified authorized servicer or representative utilized in the receipt.
14. On what date or dates did the Creditor have a risk of loss on the subject loan?
15. If the Creditor claims a risk of loss, a statement from the creditor as to whether there are any unsubrogated loss mitigation, servicer advances, advances by other parties, guarantee, loss sharing, insurance, credit default swap, or other hedge product that will reduce the Creditor's account receivable.

16. A statement from the Creditor describing the nature and amount of any net loss, either actual or potential, as it relates the subject debt at law, note, mortgage, or derivative instrument or other contract.

17. If not otherwise contained in the above paragraphs, a statement from the Creditor reporting the dates and in what amounts did the Creditor or any party on its behalf transmit or disburse any funds to any other party with respect to any transaction attributable to the subject debt, note, mortgage or derivative instrument, directly or indirectly as defined above?
18. On what dates and in what amount did the Creditor or any party on behalf of the Creditor maintain a depository account that held funds for any source relating to the subject loan directly or directly?
19. A statement from on on behalf of the Creditor declaring to whom did any agent or servicer report or provide the above-referenced reports, filings, distribution statements, financial statements, or narrative report concerning the status of the subject loan including whether the subject loan was performing or non-performing,
20. State the amount and nature of any money or other consideration paid by the Creditor or any other party and the nature, date and persons involved in any transaction in which the loan was created, originated, aggregated, assigned, transferred, securitized, or reconstituted together with the nature and status of the subject loan at the time of answering these interrogatories, as known to the Creditor or persons answering or assisting in the answer to these interrogatories.
21. State the name and contact information of the Creditor's accountant and auditor.
22. State the name and contact information of the officers of the Bank charged with the responsibility or who have been reported to regulatory authorities as managing or assessing risk assessment data for the Creditor and who have knowledge of the policies and practices of the Bank with respect to risk assessment starting with 6 months prior to origination of the subject loan documentation through the present.
23. Please identify the records custodian or custodians of the Creditor, the dates of their employment, the scope of their duties, and the dates in which they served in said capacity together with their contact information.

See also:

You qualify for the AMGAR program if you

1. Currently own property on which a home dwelling exists.
2. The property is subject to a mortgage encumbrance and you are subject to a promissory note.
3. CASH MUST BE REAL: You either have the resources to pay the full amount demanded by the parties engaged in collection on your loan OR you have an investor (family or unrelated) who possesses those resources and is wiling to issue a letter of commitment to you for refinancing the loan in the full amount of the demand. (If y ou don't have an investor, we will asssit in finding one for you).
4. CASH MUST BE DEPOSITED IN A SEGREGATED ACCOUNT: The resources available are sufficient to fund the total commitment and are available for deposit, up front, as actual cash in a trust or other designated account.
5. You have an attorney who will perform as instructed by you, subject to guidance from our consultants and attorneys.
6. You are willing to pay a large fee to the investor who assumes the risk of having to pay out the full amount demanded, while only getting a new note and mortgage that is equal to the amount paid to your current lender.
7. You are ready to act quickly to enforce your right to obtain estoppel information from the alleged lender.

See also:

1. Primarily a fee based service although an actual loan might ensue.
    1. Actual mortgage is market rate 50% LTV +/-
    2. Commitment is stated as last known demand, as adjusted by estoppel letter.
2. Virtually no actual risk although perceived risk is quite high justifying large fees.
    1. LOC times out 90 days, unless extended
    2. LOC condition subsequent lockout — i.e., litigation, appeal etc.
    3. Indemnification and hold harmless from borrower and/or third party
    4. HELOC
    5. Floor in the event of settlement
3. No involvement in litigation except potentially an officer as witness
4. Very low expenses
5. Very high margin — fee based upon agreed risk sharing
    1. Model 30%-50% LTV
    2. The higher the disparity between demand of foreclosing party and FMV the higher the percentage fee
    3. Sale into secondary market.

6. Risk sharing agreement
7. Letter of commitment
    1. Time limits
    2. Backdoor trigger if litigation ensues
    3. Full amount demanded by foreclosing party.
8. Estoppel letter
    1. Borrower files motion in court
    2. Borrower files lawsuit — failure to respond to estoppel letter request
9. My fees
    1. $7500 up front — preparation of documents etc.
    2. $15,000 minimum when concluded in favor of homeowner, or
    3. 15% of fee, which ever is higher
10. Other fees from third parties
    1. LOC can be supplemented with HELOC
11. Opportunity to demonstrate proper due diligence and disclosure as example of what should have been done.
12. Would Evolve do the servicing on the loan?

https://www.indeed.com/cmp/Evolve-Bank-&-Trust/reviews
https://www.getevolved.com/about/history-and-culture/

Evolve Bank & Trust is a branch bank founded in 1925 and headquartered in West Memphis, AR. It operates 4 branches in 11 states.
Based on its fees, size, and account interest rates this bank receives a Smart Rating of 92 out of 100, which falls short of the average of 94 for a national bank.

P.S. Nearly all community Banks and Credit Unions are bound by forced loyalty to the major banks and the EFT backbone controlled by the big banks. They will not help even if they say they will. But there are a few banks for whom this is not true. A small financial institution that wants to be involved with this project increases the likelihood of early success. Such a firm would be able to expand both deposits and profits exponentially without risk.

I have a proven plan to expand the brand of such a bank if they want to.

Regards,
GTC Honors, Inc.
Neil F Garfield, Esq. M.B.A., J.D.

www.Livinglies.wordpress.com
www.Livinglies.me
954-494-6000

**CONFIDENTIALITY NOTICE OF PRIVILEGED COMMUNICATIONS AND CAVEAT TO OPINIONS**

If you are not the intended recipient of this transmission, or have received this transmission in error, please immediately notify sender by return e-mail and DELETE the transmission(s) and its attachments without reading or saving in any manner. These communications, and any documents, files or previous e-mail messages attached to it may contain confidential or privileged information. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that you must not read or play this transmission. Any disclosure, copying, printing, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED.

**TAX MATTERS-** IRS Circular 230 Disclosure: To ensure compliance with requirements imposed by the IRS, we inform you that any tax advice contained in this communication (including attachments) was not intended or written to be used, and cannot be used, for the purpose of

(i) avoiding penalties under the Internal Revenue Code or

(ii) promoting, marketing or recommending to another party any transaction or matter addressed herein. If you would like such advice, please contact us.

**LEGAL MATTERS: To the extent that anything in this email could be construed as a legal opinion, I am licensed to practice law only in Florida (State and Federal courts) and Washington DC (by reciprocity). Further unless I have personally concluded a thorough case analysis any such statements construed as opinions are only preliminary in nature. This is not a formal legal opinion upon which you should rely. Do not act on anything contained in this email without consulting licensed local counsel.**

7 attachments

RCDSHA CONFIDENTIAL TRADE SECRETS.doc
35K

AMGAR NDA CONFIDENTIALITY AND NONDISCLOSURE NDA SAMPLE WORD.doc
40K

AMGAR - PAGES 1-6-11 AGENDA.pages
109K

AMGAR BUSINESS PLAN AS OF 10-26-11.pages
141K

Circular Draft v4 robert.docx
228K

AMGAR STAKEHOLDERS SPREADSHEET.numbers
97K

AMGAR DESCRIPTION AND OFFERING.pages
205K

Gmail — Bill Paatalo <bill.bpia@gmail.com>

# Re: AMGAR Atty's used in CA cases

1 message

**Neil Garfield** <neilfgarfieldesq@gmail.com> — Mon, Jun 19, 2023 at 12:56 PM
To: Bill Paatalo <bill.bpia@gmail.com>

I will need to dig for it

Regards,
GTC Honors, Inc.
Neil F Garfield, Esq. M.B.A., J.D.

www.Livinglies.wordpress.com
www.Livinglies.me
954-494-6000

**CONFIDENTIALITY NOTICE OF PRIVILEGED COMMUNICATIONS AND CAVEAT TO OPINIONS**

If you are not the intended recipient of this transmission, or have received this transmission in error, please immediately notify sender by return e-mail and DELETE the transmission(s) and its attachments without reading or saving in any manner. These communications, and any documents, files or previous e-mail messages attached to it may contain confidential or privileged information. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that you must not read or play this transmission. Any disclosure, copying, printing, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED.

**TAX MATTERS-** IRS Circular 230 Disclosure: To ensure compliance with requirements imposed by the IRS, we inform you that any tax advice contained in this communication (including attachments) was not intended or written to be used, and cannot be used, for the purpose of

(i) avoiding penalties under the Internal Revenue Code or

(ii) promoting, marketing or recommending to another party any transaction or matter addressed herein. If you would like such advice, please contact us.

**LEGAL MATTERS: To the extent that anything in this email could be construed as a legal opinion, I am licensed to practice law only in Florida (State and Federal courts) and Washington DC (by reciprocity). Further unless I have personally concluded a thorough case analysis any such statements construed as opinions are only preliminary in nature. This is not a formal legal opinion upon which you should rely. Do not act on anything contained in this email without consulting licensed local counsel.**

On Mon, Jun 19, 2023 at 12:29 PM Bill Paatalo <bill.bpia@gmail.com> wrote:

> Good Morning Neil,
>
> It appears that John Schleining from our Zoom call (financial backer) is willing to provide the support. However, he will do so if he can use one of the California attorneys that handled an AMGAR case previously and understands the strategy. So again, do you recall the LA counsel you worked with?
>
> Much appreciated!
>
> Bill
>
> On Wed, Jun 14, 2023 at 12:09 PM Neil Garfield <neilfgarfieldesq@gmail.com> wrote:
>
> > I should. I will look for it
> >
> > Regards,
> > GTC Honors, Inc.
> > Neil F Garfield, Esq. M.B.A., J.D.
> >
> > www.Livinglies.wordpress.com
> > www.Livinglies.me
> > 954-494-6000
> >
> > **CONFIDENTIALITY NOTICE OF PRIVILEGED COMMUNICATIONS AND CAVEAT TO OPINIONS**

Circular Draft #______, Delivered to ____________________________, on the __ day of _____, 2014

# DRAFT – SUBJECT TO REVIEW AND EDIT

# *AMGAR OFFERING CIRCULAR*

# QUALIFIED INVESTORS ONLY

# STATE OF FLORIDA

# AS OF 4-25-14

DRAFT

PREPARED BY
NEIL F GARFIELD
ALL RIGHTS RESERVED

**IMPORTANT NOTICE: This is not an offering. It is a draft of what will become an offering if target investors agree in principle to the plan and terms contained herein, as amended by subsequent discussions (without any commitment). "Qualified investors" are institutional and other investors who are highly sophisticated in the world of Wall Street Finance and whose financial circumstances and net worth qualifies under all applicable laws and rules to be "qualified investors." Qualified investors are those investors whose net worth and lifestyle would not materially change by any losses incurred in this business plan and who do NOT depend in any way upon distributions of income or profit from the investment proposed by this or any amended prospectus. Acceptance or receipt of this draft does not commit the investor to anything --- including investment or any further action, statement or participation except that this is a confidential document containing trade secrets and intellectual property of the writer that may not be distributed or disclosed to any other prospective investor or other third party --- except for professional legal or financial advisers. All Prospectuses, draft or otherwise, shall only be distributed by AMGAR, each sequentially numbered and registered to the party receiving it.**

## EXECUTIVE SUMMARY

**AMGAR was originally named for a program approved but never implemented in the State of Arizona as a government sponsored public-private business plan. The undersigned created the plan in 2008 at the request of the Chairman of the House Judiciary Committee, Adam Driggs. It bore the working name of Arizona Mortgage Guarantee And Resolution, hence the acronym, AMGAR. The acronym AMGAR is still being used under the working name American Mortgage Guarantee And Resolution.**

**The AMGAR business plan and intellectual property were developed solely by Neil F. Garfield (resume attached). Garfield is the sole author of this circular and proposes to be the fund manager, with the assistance of other people who are well versed in management of hedge funds and structured financial transactions.**

DRAFT

**AMGAR will, prior to consummating any transaction with a homeowner, deliver a letter to the Office of the Attorney General of the State of Florida giving notice and an executive summary of this business plan. A reasonable period of time, not to exceed 60 days, will be allowed for the Attorney General's office to respond with comments, if any. There is no guarantee that the Attorney General will respond. If the comments are negative, AMGAR will undertake reasonable efforts to adjust the business plan or disclosure documents to fit the comments. If AMGAR is not able to adjust the AMGAR business plan without material deviation from the terms expressed herein, management shall either terminate the offering or ask the shareholders to vote on whether to proceed. A majority vote will prevail. All shareholders shall receive a copy of the comments from the Attorney General's office. Operations of AMGAR shall continue in selection of cases and start-up of operations commencing on the close-out date. Certain expenses during that period shall not be recoverable, regardless of the nature of the comments, if any, received from the Attorney General's Office.**

**The plan is based upon the premise that many banks and servicers that have initiated foreclosure on residential and/or commercial properties where such parties are in fact strangers to any transaction between either a creditor or debtor in any related mortgage loan transaction. The plan calls for a direct challenge in selected cases wherein the borrower enters into an agreement for refinancing with AMGAR, an offer is made to pay the entire balance due as demanded --- provided the Plaintiff in a judicial foreclosure action (or trustee/beneficiary in a non judicial foreclosure sale) can prove actual ownership and proof of balance, applying all appropriate third party payments that do not give rise to subrogation. The elements of proof are solely as provided in the AMGAR commitment and cannot be changed by any court or third party.**

**The success of the plan depends largely upon the premise that the vast majority (95%+) of the foreclosing entities will be unable to prove either one, and that an appropriate order will be entered by the court either barring the foreclosure sale, canceling the mortgage instrument and/or entering judgment in favor of the homeowner. In some cases an order declaring the status of title or quieting title might be obtained.**

DRAFT

**In effect, AMGAR is offering an actual funded assumption of risk in exchange for the prospect of receiving an actual note and mortgage free from any of the defenses involved with loans subject to claims of securitization. AMGAR also will advance the expenses of investigation, analysis, expert declarations, and litigation on behalf of the homeowner, in addition to covering its own expenses of operation and selection of appropriate cases in which to make the offer. Such expenses may or may not be recovered from the borrower or the lender or pretender lender.**

**AMGAR will only approve primary transactions where management is reasonably certain that the AMGAR mortgage from the homeowner will have first priority over all other mortgages.**

**Other factors that are important elements of success include but are not limited to the following:**

## SUMMARY OF OFFERING

**AMGAR will operate as closed end hedge fund. Investor funds are deposited into the hedge fund trust account. AMGAR, as part of its business strategy may deposit funds into the trust accounts of various lawyers according to the AMGAR business plan.**

**AMGAR has elected in its first offering to accept Subscription Agreement for a maximum of 2,000 shares from accredited investors only. The initial Offering Price for each share in the hedge fund shall be one million dollars per share ($1,000,000 USD). The fund will have a maximum of 200 investors.**

**As a Management Incentive Bonus, a maximum of one percent (1%) of the authorized shares (a total of 20 shares) may be awarded as a Management Incentive Bonus for meeting certain agreed upon performance benchmarks detailed in the minutes of the hedge fund. All Management Incentive Bonus will require majority (fifty-one percent [51%]) vote of the current existing shareholders at the time of award. It is the intent of the hedge fund that for all funds received from investors, that these funds will be insured to the maximum amount allowed by law. Other than the Management Incentive Bonuses disclose herein, there will be no other dilution of investors shares.**

DRAFT

**Minimum Subscription Commitment. AMGAR requires that a minimum of $6,000,000 in Subscription Agreements must be received, deposited, and cleared for the hedge fund to begin operations. If the Minimum Subscription Commitment is not met by May 30, 2014 all funds will be returned and this offering terminated. AMGAR believes that initial founding investors exist to meet this requirement in May 2014. AMGAR will not accept the current price for the Subscription Agreement after the earlier of issuing 2000 shares subscribed or July 30, 2014. To provide diversity in the fund, no single investor may own more than ten percent (10%) of the authorized shares of the hedge fund (this represents 200 shares).**

**Management in order to carry our its strategies within the Business Plan, may be required to form multiple entities in various jurisdictions. Each entity shall be wholly-owned or controlled by AMGAR and shall be consolidated into one financial statement for AMGAR. All such entities for purposes of this offering shall be treated as conduits for the entire AMGAR fund and no such "separate" entity shall be withheld from either reporting or distribution requirements. It is the intention of the hedge fund to prepare financial statements at the close of each year using generally accepted accounting principles (GAAP) as is commonly accepted for hedge funds. We shall retain independent auditors and require at least an annual report on the fund's financial matters. This report will be made available as required by law and to all shareholders.**

DRAFT

**The management team may delegate its function to a separate entity only if the management team disclosed herein controls that entity. No withdrawals from invested capital shall be allowed for management, expenses or overhead except for an Initial Fee of 8.5% and an Annual Fee 5.5%. (See SELECTION EXPENSES, GENERAL AND ADMINISTRATIVE COSTS AND EXPENSES, MANAGEMENT COMPENSATION, USE OF PROCEEDS). The annual fee will first be taken from profits, if any, and then if any remainder is payable from the investment fund. AMGAR shall from the Initial Fee and the Annual Fee cover all costs of operations for AMGAR.**

**Additional Charges To The Fund. Once an agreement has been signed with a homeowner, management may allocate up to $30,000 in expenses per case relating to producing a desirable result. Our target mortgages for refinancing shall be those with promissory notes in which the initial nominal principal due was (at the time of closing the "securitized loan" with the borrower) no less than $300,000 nor more than $750,000.**

**Disclosure Of Garfield Interests. Garfield retains direct or indirect interests in some of the law firms that are likely to be employed on behalf of the borrower. Therefore he or his designee might receive some direct or indirect benefit or compensation from those interests.**

## Summary of Management and Third Party Vendors

FUND MANAGER: Neil F Garfield, Esq. MBA, JD. Former Investment banker, previously licensed in the sale of securities (expired), licensed member of the Florida Bar in good standing. Resume attached. Garfield currently maintains law offices in Tallahassee and Fort Lauderdale. In addition he is an expert witness listed as a trial witness in several cases. He also write daily articles on his blog, www.livinglies.wordpress.com which has been published for 7 years. In addition he has interests in companies that perform electronic funds transfer. Starting with his first distribution as shown on the attached spread sheets, incorporated herein by reference, Garfield will not accept any new clients as attorney or as expert but will continue writing on his blog and making radio and TV appearances. All existing expert engagements will be concluded as contracted unless another expert can be found. All existing legal cases in which he is the attorney of record will be concluded wherever it will not prejudice the client. Garfield will refund to the client or pay the successor attorney for taking over the cases. Virtually all his time will be spent on AMGAR except for personal time and what is described above.

GENERAL COUNSEL: Keith Austin, JD. licensed member of the Florida Bar in good standing. Resume attached. Austin maintains a long standing law practice but is prepared to devote the majority of his time toward the needs of AMGAR starting with his first distribution as shown on the attached spreadsheets.

DRAFT

FUND ADMINISTRATOR and IT Manager: Robert Needham, JD, PhD, Resume Attached. Needham has multiple business interests and serves as consultant and business development adviser to many companies. Starting with his initial distribution on the attached spreadsheet, he has agreed that he shall devote his time and efforts primarily to the success of AMGAR as needed, recognizing that the initial set up and launch of AMGAR will be time intensive.

HEDGE FUND TRADING MANAGER: to be decided

Founding investors, resumes attached

Third Party Vendors:

1. GTC Honors: Communications, relationships
2. DTC Systems: forensic and credit investigations
3. Key1 Loan Servicing and Origination: Licensed "lender" and servicer

SEE COMPENSATION OF OFFICERS AND THIRD PARTY VENDORS

# AMGAR--AMERICAN MORTGAGE GUARANTEE AND RESOLUTION AGENCY

## I. TRADING DISK OR AUCTION

### A. TITLE

1. signatures
2. AMGAR Guarantee
   a) Government Guarantee
   b) Insurance --- 30% of FMV
3. AMGAR Approval
   a) Quiet Title Affidavit
      (1) Registration Fee Dept of revenue $250
4. AMGAR Resolution
   a) Quiet title affidavit
   b) Expedited summary judicial proceedings
   c) Title report
      (1) Gaps in Title Identified
      (2) Gaps in securitization identified
         (a) Investor supplies prospectus and Reports
      (3) Creditor and Debtor identified
      (4) Legislation: AMGAR Resolution report and Affidavit clears title
      (5) Legislation: AMGAR Officers cleared by MERS method

### B. FINANCING

1. SELF FUNDING
   a) Fee to Borrowers $25
   b) Fee to Lenders' Registration with AMGAR
      (1) $10,000 each Certificate, regardless of number of loans in pool.
      (2) Equals $1 per loan.
   c) Reverse Credit Default Swap Trading Fee: $150
   d) Investor Fee: $10,000
   e) Settlement/Modification Fee for AMGAR approval
      (1) Cash for Keys: $100
      (2) Cash for Signature: $200
      (3) Modification between Investors and Borrower: $300

(4) Legislation: Requirements for Standing to Challenge
(5) Legislation: Signature of Servicer not Required
(a) Servicer claims for fees unsecured
(b) Elements of Servicer claims against Investors

2. Management: AMERICAN HOMEOWNERS COOPERATIVE --- livinglies blog
a) Robert Needham
b) Email partner
c) Site hosting partner
d) GTC-Livinglies

3. Operations on AHC Site
a) AUCTION READY
b) forms
(1) Homeowners
(2) Lenders
(3) Vendors
(4) Notice of Contest --- see standing requirements
c) Homeowner Members
d) Lender Members
e) Vendor members
(1) Assistance to Homeowner borrowers
(2) Qualification of borrowers
(a) No declines if borrower up to date
(b) FICO at inception of loan used
(c) Appraisal
(d) Employment
(e) 6 month window --- no foreclosure
i) Short-Sale approval
ii)
f) AHC 18% Management and Processing Fees
(1) Vendor distribution
(2) Net to State Fixed per Item
(3) Balance to Second Management Company
(a) New Mexico LLC lending company
(b) Loans for tuition and other expenses
(c) Forgiveness of loans off balance sheet

# II. Second subtopic

## A. First Point

1. Supporting Point
2. Supporting Point

## B. Second Point

1. Supporting Point
2. Supporting Point

# III. Conclusion

# EXHIBIT C

SilverFlume
NEVADA'S BUSINESS PORTAL

**Compliance Hold:** **Series LLC:** **Restricted LLC:**

**Filing History Details**

| File Date | Effective Date | Filing Number | Document Type | Amendment Type | Source |
|---|---|---|---|---|---|
| 10/31/2025 | 10/31/2025 | 20255279825 | Annual List | | External |
| 10/16/2024 | 10/16/2024 | 20244403781 | Annual List | | External |
| 08/18/2023 | 08/18/2023 | 20233422422 | Annual List | | External |
| 10/27/2022 | 10/27/2022 | 20222718086 | Annual List | | External |
| 09/15/2021 | 09/15/2021 | 20211752162 | Annual List | | External |
| 11/02/2020 | 11/02/2020 | 20201026945 | Annual List | | Internal |
| 01/07/2020 | 01/07/2020 | 20200402072 | Amendment to Articles of Organization | Name Change | External |
| 10/11/2019 | 10/11/2019 | 20190218195 | Annual List | | External |
| 10/09/2018 | 10/09/2018 | 20180441276-55 | Initial List | | External |
| 10/09/2018 | 10/09/2018 | 20180441275-44 | Articles of Organization | | External |

Page 1 of 1, records 1 to 10 of 10

**Filing Date SnapShot As Of: 10/11/2019**

Business Details | Name Changes | Principal Office | Registered Agent | Officer Information | Shares

| Date | Title | Name | Attention | Address1/Address2/City/State/Zip/Country |
|---|---|---|---|---|
| 10/09/2018 | Manager | ROBERT W STEELE | | PO BOX 27740, LAS VEGAS, NV, 89126, USA |
| 10/09/2018 | Manager | GARY M KOEPPEL | | PO BOX 27740, LAS VEGAS, NV, 89126, USA |

# EXHIBIT D

Gmail

Bill Paatalo <bill.bpia@gmail.com>

## Rexnet Pitch Deck

1 message

**Gary Koeppel** <gary@coastgalleries.com>
To: Paatalo Bill <bill.bpia@gmail.com>

Fri, May 26, 2023 at 2:42 PM

Would love your impression!

**Rexnet_Pitch Deck.pptx**
18857K


M31 CAPITAL
REAL ESTATE EXCHANGE NETWORK
REXNET


REXNET
REXNET
REXNET
REXNET
REXNET
The
Real Estate
Disruptor



INFLATION, DEBT AND MONEY
Inflation has devalued the US dollar to 4 cents.
US Debt is $30 trillion. Global Debt is $300 trillion.
Money is mutating from Fiat to Digital and Crypto.
Central Banks own digital and People own Crypto.


THE IMPENDING GLOBAL DEPRESSION
Central Banks have overprinted fiat money, increasing supply and easy credit
Production is declining, lenders are vanishing, borrowers cannot borrow more
Markets and assets will crash, debtors will go broke and sovereigns will default


PROBLEM,
The $128 trillion global real estate market will collapse during the coming world depression.
Existing real estate marketing and transacting methods are unprepared and will not survive
REXNET digitizes real estate transactions and monetizes deals with a unique cryptocurrency.



REXNET TRANSACTION SERVICES
RLS - REXNET Listing Service advertises real estate haves, wants and other assets
RSS - REXNET Strategy Search Engine finds instant solutions to complex problems
RNS - REXNET Negotiating Service directly connects P2P buyers, sellers and traders
RTP - REXNET Transaction Platform creates smart escrow contracts on blockchains
RCC – REXNET Custom Coin Service creates individual, corporate & sovereign cryptos
RCX - REXNET Crypto Exchange trades REXNET tokens and select cryptocurrencies
RLB – REXNET Lending Bank loans low-interest REXNET Tokens for transactions
RBC – REXNET Blockchain records smart contracts for all real estate transactions


REXNET TRANSACTION PORTAL
Join Rexnet
List Assets
Search Strategies
Negotiate a Deal
Buy or Borrow Tokens
Complete the Deal
Digitize Documents
Create Smart Contract
Record on Blockchain


Proof-of-Use Pricing
The REXNET Token is a new crypto concept for buying and selling real estate and assets.
The unique Proof-of-Use pricing method increases the token price by $0.01 for every $1,000,000 tokens used in valid transactions.
Rexnet is issued from its Exchange, used in transactions and recorded its Blockchain to prevent shorting, dumping and pumping.
100,000,000,000 Issued on the Binance Blockchain
Note: Upon completion of the REXNET Blockchain, the REXNET TOKEN will become the REXNET COIN.


PROOF-OF-USE BENEFITS
REVOLUTIONARY For every $1,000,000 Tokens used, the price increases one cent
APPRECIATIVE Token price increases with verified usage and never decreases
UTILITARIAN Every verified transaction using the Token increases its value
TRUSTWORTHY Verified Token usage produces a responsible and trusted price
STABILITY Proof-of-Use Pricing is impervious to volatility via speculation
NON-SECURITY Pricing requires active use participation and fails the Howie Test


REXNET
MEMBERSHIP Annual Fees for
TOKEN SALES Cash Sales and
SUB-TOKENS Formation Fees and Bonus Coin Commissions
LENDING Low Interest Rates for REXNET Token Borrowers
TRANSACTING Low Success Fee for Member Transaction



REXNET DIVISIONS
Exchange
REXNET
Crypto
Join the Network
of Problem Solvers!
REXNET
REXNET
Transaction
REXNET
Lending
REXNET
MEMBER


REXNET CUSTOM COINS
REXNET creates Custom Coins for Individuals, Companies & Sovereigns.
Custom Coins use the Proof-of-Use Cryptocurrency pricing method.
Custom Coins are listed on the Rexnet Exchange Network with other Cryptos .




MILESTONES
Secure Funding and Team
NON-LINEAR
Build Blockchain and Exchange
SIMULTANEOUS
Integrate vFairs and Oval Room
WARP SPEED
Embed DocuWalk and Propy
Refine User Interface
Revise Listings Format
Complete Web Portal
Market and Launch


Exploring Synergies
Cosmos
Stacks
GMX
Propy
Livepeer
vFairs
Huddle
DocuWalk
Tokamak
Oval Room
Shelter Zoom
M31 CAPITAL
Sentinel
Push Protocol
ThorChain

[illegible]

<u>Profits from Custom Crypto Coin Creation</u>

In 2021 REXNET created a Custom Coin for a real estate syndicator and earned a formation fee of $282,000 and success fee of 25,000,000 Tokens issued at 0.$0001, now priced at $0.8663178 and worth $21,657,945.

<u>REXNET Ownership of Master Custom Token</u>

In 2022 REXNET created, owns and controls the generic, master REXNET Charity (501(c)3 Token used for charitable real estate donations. Every use and price increase benefits REXNET.

<u>Fraction Real Estate Purchase with Crypto</u>

In 2020 REXNET purchased 10% of a $5.5m resort development property, which was reappraised in 2023 at $9m. Upon infra-structure completion, the property will be worth $70m and REXNET's equity will be $7m.

<u>Lending Sub-Custom Crypto Token for Cash</u>

In 2021 a REXNET Sub-Coin owner made a real estate loan of $400,000 ($300,000 cash plus $100,000 Sub-coin) repaid in 2 years ($464,000 in cash) yielding a 22.8% ROI.

[illegible]

# REXNET FIVE-YEAR PROJECTIONS

| INCOME | 2024 | 2025 | 2026 | 2027 | 2028 | 5 YEAR TOTAL | ANNUALIZED |
|---|---|---|---|---|---|---|---|
| Membership, Individual | $ 2,500 | $ 5,000 | $ 7,500 | $ 10,000 | $ 15,000 | $ 40,000 | $ 8,000 |
| Membership, Corporate | $ 10,000 | $ 30,000 | $ 50,000 | $ 75,000 | $ 100,000 | $ 265,000 | $ 53,000 |
| Membership, Elite | $ 50,000 | $ 100,000 | $ 150,000 | $ 200,000 | $ 250,000 | $ 750,000 | $ 150,000 |
| Custom Com, Individual | $ 250,000 | $ 350,000 | $ 500,000 | $ 750,000 | $ 1,250,000 | $ 3,100,000 | $ 620,000 |
| Custom Com, Corporate | $ 300,000 | $ 1,500,000 | $ 2,100,000 | $ 3,000,000 | $ 4,500,000 | $ 11,400,000 | $ 2,400,000 |
| Custom Com, Sovereign | $ - | $ - | $ 15,000,000 | $ 22,500,000 | $ 37,500,000 | $ 75,000,000 | $ 15,000,000 |
| Services Success Fee | $ 500,000 | $ 500,000 | $ 1,000,000 | $ 2,000,000 | $ 4,000,000 | $ 8,000,000 | $ 1,600,000 |
| Token Lending | $ 400,000 | $ 400,000 | $ 600,000 | $ 1,500,000 | $ 3,000,000 | $ 5,900,000 | $ 1,180,000 |
| **TOTAL PROJECTED INCOME** | **$ 2,112,500** | **$ 2,885,000** | **$ 19,407,500** | **$ 30,035,000** | **$ 50,615,000** | **$ 105,055,000** | **$ 21,011,000** |
| *$ Growth* | *$ 2,112,500* | *$ 772,500* | *$ 16,522,500* | *$ 10,627,500* | *$ 20,580,000* | | |
| *% Growth* | | *137%* | *673%* | *155%* | *169%* | | |

| EXPENSES | 2024 | 2025 | 2026 | 2027 | 2028 | TOTAL | ANNUALIZED |
|---|---|---|---|---|---|---|---|
| Legal | $ 45,000 | $ 60,000 | $ 75,000 | $ 100,000 | $ 125,000 | $ 405,000 | $ 81,000 |
| Accounting & Bookkeeping | $ 12,000 | $ 18,000 | $ 24,000 | $ 36,000 | $ 48,000 | $ 138,000 | $ 27,600 |
| Insurance | $ 10,000 | $ 15,000 | $ 15,000 | $ 20,000 | $ 25,000 | $ 85,000 | $ 17,000 |
| Conferences | $ 20,000 | $ 25,000 | $ 35,000 | $ 45,000 | $ 55,000 | $ 180,000 | $ 36,000 |
| Website | $ 48,000 | $ 60,000 | $ 72,000 | $ 96,000 | $ 96,000 | $ 372,000 | $ 74,400 |
| Admin / Office | $ 75,000 | $ 100,000 | $ 125,000 | $ 150,000 | $ 250,000 | $ 700,000 | $ 140,000 |
| Board of Directors | $ 500,000 | $ 500,000 | $ 500,000 | $ 500,000 | $ 500,000 | $ 2,500,000 | $ 500,000 |
| Salaries | $ 1,500,000 | $ 1,950,000 | $ 2,400,000 | $ 3,000,000 | $ 3,900,000 | $ 12,750,000 | $ 2,550,000 |
| Developers | $ 500,000 | $ 750,000 | $ 950,000 | $ 950,000 | $ 950,000 | $ 4,100,000 | $ 820,000 |
| Blockchain | $ 450,000 | $ 100,000 | $ 100,000 | $ 125,000 | $ 150,000 | $ 925,000 | $ 185,000 |
| Crypto Exchange | $ 360,000 | $ 75,000 | $ 75,000 | $ 100,000 | $ 125,000 | $ 735,000 | $ 145,000 |
| Marketing | $ 125,000 | $ 150,000 | $ 200,000 | $ 250,000 | $ 300,000 | $ 1,025,000 | $ 205,000 |
| OvalRoom | $ 10,000 | $ 25,000 | $ 50,000 | $ 100,000 | $ 200,000 | $ 385,000 | $ 77,000 |
| DataWalk | $ 5,000 | $ 12,500 | $ 25,000 | $ 50,000 | $ 100,000 | $ 192,500 | $ 38,500 |
| Vfairs | $ 5,000 | $ 7,500 | $ 15,000 | $ 25,000 | $ 50,000 | $ 102,500 | $ 20,500 |
| Proxy | $ 12,000 | $ 18,000 | $ 24,000 | $ 30,000 | $ 36,000 | $ 120,000 | $ 24,000 |
| **TOTAL OPERATING EXPENSES** | **$ 3,667,000** | **$ 3,866,000** | **$ 4,685,000** | **$ 5,577,000** | **$ 6,910,000** | **$ 24,705,000** | **$ 4,941,000** |
| *$ Growth* | *$ -* | *$ 199,999* | *$ 819,999* | *$ 891,999* | *$ 1,332,999* | | |
| *% Expense Margin* | *74%* | *34%* | *-76%* | *-81%* | *-86%* | | |
| **EBITA** | **$ (1,554,500)** | **$ (981,000)** | **$ 14,722,500** | **$ 24,458,000** | **$ 43,705,000** | **$ 80,350,000** | **$ 16,070,000** |



## Robert W. Steele, SEC

Robert Steele is a real estate icon who is a Lifetime Member and designated "*Legend of the National Society of Exchange Counselors*".

He has published two magazines and authored 19 books, including the industry standard, 400-page book, "*300 Ways to Buy, Sell or Exchange Real Estate.*"

Robert founded the original Real Estate Expo in Las Vegas and has educated thousands of real estate professionals about selling and exchanging real estate.

He was one of the first first to explore and apply cryptocurrency to real estate transactions. He has co-founded , a revolutionary online real estate portal using CryptoCurrencies.

Robert is revered as a Master of Real estate and has pioneered new technologies for an old industry.



## Gary M. Koeppel, BS, BA, MFA

Gary Koeppel is a serial entrepreneur with several careers throughout his creative if eclectic career.

He has been a university professor, artisan, art galleries owner, an art and book publisher, an events producer, and has authored two novels and a television screenplay.

He produced 40 art exhibitions in Europe and the US and has donated the Enduring Freedom Tribute sculpture to the Pentagon where it is displayed at the main entrance.

He founded the Big Sur Chamber of Commerce and fire department, a newspaper and a non-profit foundation for placing patriotic artworks in public places.

Koeppel created a method to remove plastics from the ocean and co-founded Rexnet, a crypto and real estate transaction portal at [illegible].



Thank you for your consideration.
The Founders

# EXHIBIT E

RONALD H. FRESHMAN (SBN 225136)
LAW OFFICES OF RONALD H. FRESHMAN
3040 Skycrest Drive
Fallbrook, California 92028
Telephone: (858) 756-8288
Facsimile: (858) 964-1728
Email: rhf@freshmanlaw.com

Attorney for Plaintiffs,
GARY MERLE KOEPPEL and EMMA K. KOEPPEL, individually and as Trustees for the KOEPPEL FAMILY TRUST

JESSICA R. MACGREGOR, Bar No. 168777
JOHN B. SULLIVAN, Bar No. 238306
ABIGAIL W. HENDERSON, Bar No. 338358
LONG & LEVIT LLP
465 California Street, Suite 500
San Francisco, California 94104
Telephone: (415) 397-2222
Facsimile: (415) 397-6392
Email: jmacgregor@longlevit.com
jsullivan@longlevit.com
ahenderson@longlevit.com

Attorneys for Defendants
STEVEN WILKER and TONKON TORP LLP

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION**

GARY MERLE KOEPPEL, individual and as Trustee for the KOEPPEL FAMILY TRUST; EMMA K. KOEPPEL, individual and as Trustee for the KOEPPEL FAMILY TRUST,

Plaintiffs,

v.

STEVEN WILKER; TONKON TORP, LLP, DOES 1-10,

Defendants.

Case No. 5:24-cv-06457-NW

**PARTIES' JOINT REPORT ON MONTANA ACTION AND PLAINTIFFS' PRODUCTIONS PURSUANT TO COURT ORDER RE APRIL 21, 2026 HEARING [DOCKET 158]**

Action Filed: July 25, 2024

Pursuant to Docket 158, the Parties submit this joint report regarding the status of the Montana Action and Plaintiffs' production.

# I. THE MONTANA ACTION

## A. Plaintiffs' Position

Defendants' submission focuses extensively on Mr. Paatalo and collateral issues arising in the Montana action. That focus does not address the subject of this report: Plaintiffs' compliance with this Court's order regarding Mr. Koeppel's production.

Plaintiffs complied with the Court's directive by undertaking a comprehensive, good-faith production of Mr. Koeppel's materials under significant time constraints. Within approximately eleven days, Plaintiffs coordinated with the client to identify, collect, organize, and review a large volume of materials spanning fifteen (15) years and multiple sources. Plaintiffs collected and are preparing a dataset exceeding 22,000 pages of materials responsive to the Court's April 23, 2026 Order. Within the compressed timeframe, Plaintiffs produced approximately fifty percent of those materials, consisting of all non-privileged documents identified through counsel's good-faith review, organized by year and provided in a format designed to facilitate review.

Plaintiffs further clarify that the production to date reflects all non-privileged documents identified through Plaintiffs' good-faith review process (approximately 5,500 pages representing approximately 749 non-privileged emails with all attachments.) . Given the volume of materials collected—exceeding 22,000 pages—Plaintiffs prioritized the immediate production of non-privileged documents in order to comply with the Court's directive within the compressed timeframe.

To the extent Defendants identify purported "gaps" in Plaintiffs' production—whether based on the absence of communications with particular individuals (e.g., a bookkeeper, third-party consultants, or investors) or materials from specific time periods—those assertions reflect subjective expectations, not deficiencies in production. Plaintiffs' production is based on the Court-directed search methodology and a good-faith review of collected materials. The presence or absence of communications with any particular individual or topic in a given tranche reflects the results of that process, not a failure to comply. Plaintiffs are continuing to review and supplement on a rolling basis and will produce any additional responsive, non-privileged documents identified through that process.

The remaining documents are undergoing careful privilege review. Plaintiffs are not withholding documents wholesale; rather, where privilege applies, Plaintiffs are producing documents in redacted form wherever possible, limiting withholding and instead preserving transparency through targeted redactions. This process necessarily requires individualized review to ensure that privileged communications are properly identified and protected while maximizing production.

Plaintiffs are continuing this review on a rolling basis and will supplement production promptly as redactions are completed, along with a corresponding privilege log. Under the circumstances—including the breadth of the materials and the time constraints imposed—this phased approach reflects a reasonable and good-faith effort to comply fully with the Court's order. This is precisely the type of staged production contemplated in large-volume document reviews.

### B. Defendants' Position: Mr. Paatalo Has Not Complied With Judge Molloy's Orders; His Production Remains Substantially Incomplete

The Court is all too familiar with Mr. Paatalo's failure to comply with orders issued by Judge Molloy. Defendants filed the Montana Court's order re contempt issued on May 4, 2026 via Docket 166.

On April 21, 2026, the Montana Court issued a contempt order exposing him to a $100 a day penalty if he did not provide all the emails he identified in his February 23, 2026, including those included in Mr. Koeppel's privilege log and any other documents responsive to Defendants' subpoena. On April 22, Mr. Paatalo produced only a smattering of the previously identified but unproduced emails. He attempted to obfuscate his incomplete production by providing thousands of emails attaching his declarations submitted in other cases. The production of emails attaching his declarations in other cases augmented the email count. Defendants believe Mr. Paatalo dumped thousands of emails attaching declarations to attempt to convince Judge Molloy he is not in contempt based on numbers alone. Based on Defendants' review, Mr. Paatalo is in contempt.

To understand why, one must begin with Mr. Paatalo's February 23, 2026 Response and Categorical Log, in which he represented he: 1) objected to producing declarations he signed under penalty of perjury and identified none; and, 2) identified a total email population of 6,143 emails.

He broke the emails into six categories by subject, time frame and participants:

1. Pre-Counsel Investigate Communications
   a. 2/7/2012-8/1/2015
   b. Gary Koeppel and Bill Paatalo
2. Quiet Title Litigation Support Period
   a. August 2, 2015-March 1, 2018
   b. Gary Koeppel, Ron Freshmn, Kimberley Cromwell, Bill Paatalo
3. Continuing Investigative Consulting And Proprietary Research
   a. March 1, 2018-May 14, 2021
   b. Gary Koeppel and Bill Paatalo
4. Declaratory Relief Litigation Support
   a. May 14, 2021-September 26, 2022
   b. Gary Koeppel, Ron Freshman, Kimberly Cromwell, William Paatalo
5. Wilker Litigation Period
   a. February 3, 2021-November 29, 2023
   b. Produced 404 emails on 2/23/2026
6. Consulting Litigation Support And Proprietary Business Development
   a. November 29, 2023-present
   b. Gary Koeppel and Bill Paatalo
7. Personal And Non-Responsive Communications
   a. February 7, 2012-present
   b. No participants identified
   c. "Purely personal communications unrelated to the matters at issue, including family correspondence, social communication and private matters"

Mr. Paatalo estimated that category 7 comprised 15-20% of the 6,143 emails. In other words, 921 to 1,228 of the 6,143 emails were allegedly "private" and not related and 5,222 to 4,915 were not private.

Mr. Paatalo made four productions of his communications with Mr. Koeppel:

| DATE | EMAIL COUNT |
|---|---|
| February 24, 2026 | 340 |
| April 1, 2026 | 154 |
| April 16, 2026 | 156 |
| April 22, 2026 (Non-Responsive Koeppel Communications)[1] | 627 |
| Total Emails with Plaintiff | 1,277 |

[1] Many of these emails report on and attach pictures of Mr. Paatalo's children, so it appears Mr. Paatalo produced some of the materials he identified as "personal and non-responsive" documents in his February 23, 2026 log. These emails are relevant to prove just how close Mr. Paatalo and Mr. Koeppel are.

Based on Mr. Paatalo's representation to the Court on February 23, 2026, he has produced only 20% of the emails he identified and continues to withhold 80%.

Searches were conducted in the various productions to gain a better understanding of what has not been produced. Despite the high level of foreclosure and litigation activity from 2023 to the present, only 244 of the emails produced are from this time period. Although it is well known he and Mr. Koeppel are involved in a business called Rexnet which apparently has a business plan to sell AMGAR, Mr. Paatalo produced only two documents related to this enterprise. In the group of emails referenced above, there are only 123 emails with Mr. Freshman. There are no emails with the Ohio investor or Montana investor who purportedly were being considered to act as the lender in AMGAR.

To make it appear he has complied with Judge Molloy's order, Mr. Paatalo also produced "additional non-responsive documents" on April 22, 2026, which include 5,197 emails. Most of the emails and their attachments consist of declarations Mr. Paatalo drafted in other matters. By way of example, the word "Declaration" produces 5,747 hits across the 5,197 emails. The emails are sent to a variety of recipients other than Mr. Freshman. Mr. Paatalo initially objected to producing any declaration he signed in the last 10 years and he was careful not to include them in his categorical log of the 6,143 emails he gathered. It is clear then that none of the 5,147 "additional non-responsive" emails produced by Mr. Paatalo on April 22, 2026 was ever part of the original count of emails.

Finally, Defendants have conducted word searches on each entry included in Mr. Koeppel's 273 item privilege log. Except for 18 emails produced on April 16. 2026, no other documents were produced from the log.

Defendants will be providing this information to Judge Molloy and will be seeking an order requiring Mr. Paatalo to allow a forensic IT professional to image the responsive materials.

## II. PLAINTIFFS' DOCUMENT PRODUCTION

### A. Plaintiffs' Position

Defendants' reliance on a purported universe of "6,143 emails" is misplaced and does not bear on Plaintiffs' production obligations in this action. As reflected in Mr. Paatalo's February 23,

2026 response and categorical log—on which Defendants rely—that figure encompasses multiple categories of materials, including documents responsive to separate requests such as RFP No. 14 (executed declarations), as well as non-responsive and personal communications, and materials unrelated to the claims and defenses in this litigation. It is therefore not a discrete set of emails between Mr. Koeppel and Mr. Paatalo, nor does it represent a body of documents that is uniformly responsive to the requests at issue here.

Accordingly, Defendants' suggestion that there exist "6,143 emails" between Mr. Koeppel and Mr. Paatalo that should have been produced is incorrect. Plaintiffs' review confirms that there is no such volume of direct communications between those individuals, and certainly nothing approaching that number of responsive, non-privileged emails.

To date, Plaintiffs have identified approximately 2,210 emails responsive to the Court's April 23, 2026 Order, subject to ongoing verification. This set includes communications beyond Mr. Paatalo, including counsel in this litigation, five additional attorneys, and other relevant participants. Of these, approximately 749 emails have been identified as non-privileged and have been produced, while approximately 1,465 emails have been identified as potentially privileged and are undergoing attorney review and verification.

These figures reflect discrete emails, as well as complete chains and threads, together with their associated attachments. Plaintiffs' production is focused on compliance with the Court's order through a structured, good-faith review process. 2015 to 2018 emails and documents have been reviewed, redacted where appropriate and produced. Counsel is working on 2019 to 2026.

Plaintiffs conducted the collection and export process at the direction of counsel using search terms consistent with the Court's April 23, 2026 Order. Mr. Koeppel **did not independently** determine what documents to include or exclude; rather, he followed counsel's instructions and exported materials based on those defined parameters.

Counsel—not the client—is responsible for the legal review of those materials. Following collection and export, counsel has undertaken and continues to undertake an individualized review for responsiveness refinement and privilege, including the application of targeted redactions and preparation of the privilege log.

This process ensures that the collection was comprehensive and neutral, while the legal determinations regarding responsiveness and privilege are being made by counsel in a structured, good-faith manner consistent with the Federal Rules.

Plaintiffs produced all non-privileged emails identified through this process on Friday, May 1, 2026, in PDF format with bookmarks to facilitate review. Plaintiffs are continuing to review remaining materials for privilege and are producing those documents in redacted form where appropriate, consistent with a policy of minimizing withholding and maximizing transparency.

Plaintiffs also address Defendants' reference to communications involving Mr. Steele. Certain emails including Mr. Steele were initially identified during privilege review. Upon further review by counsel, Plaintiffs determined that many of those communications are not privileged, and they have been produced, including within the 2017 and 2018 productions, with limited redactions applied only where privileged content appears within otherwise producible email chains. Plaintiffs further clarify that Mr. Steele was not involved in the quiet title litigation, the MERS-related litigation, the declaratory relief action, or Defendants' representation. His communications consist of personal opinions and commentary, rather than participation in or coordination of the legal matters at issue and has no relationship to the Wilker representation.

This reflects Plaintiffs' ongoing, good-faith refinement of privilege determinations, consistent with their approach of minimizing withholding and producing documents with targeted redactions wherever appropriate.

As of this report, Plaintiffs will have completed and produced privilege-reviewed materials for the 2015–2018 period. Review of later materials has been temporarily paused to finalize Plaintiffs' Reply to Defendants' Objection to Motion for Leave to File Motion for Reconsideration and to prepare the privilege log, which will be detailed for 2015–2018 and categorical for 2019–2026 and this update. Plaintiffs intend to promptly resume and complete privilege review and supplemental production on a rolling basis completing what can be completed today, and resuming on Wednesday after Tuesdays CMC which will pull counsel away from this for the full day.

Given the volume of materials, the multi-year scope, and the individualized review required for privilege determinations, it is not feasible to complete production of all materials by the 5:00 p.m.

deadline. Plaintiffs' production to date, and their ongoing supplementation, reflect a reasonable and good-faith effort to comply fully with the Court's order.

Plaintiffs respectfully request a brief extension of time to complete the remaining privilege review and supplemental production. Plaintiffs are proceeding diligently and in good faith and are continuing production on a rolling basis. A short extension will allow Plaintiffs to complete this process in a manner consistent with their obligations under the Federal Rules and the Court's order, while ensuring that privilege determinations are accurate and appropriately documented.

**B. Defendants' Position: Mr. Koeppel's Production Appears To Be Incomplete**

Plaintiffs provided a dropbox link to their production at 8:16 p.m. on Friday evening. The production was not in native format. Instead, Plaintiffs provided seven pdfs, each of which contained hundreds or thousands of pages of emails. The individual pdfs were not bookmarked, making the process of review more cumbersome. On Monday, May 4, 2026, Plaintiffs produced another tranche of materials, also in pdf format. By this time Defendants determined Plaintiffs produced one pdf twice on May 1st. Plaintiffs produced another pdf including emails from 2023 this morning when notified. Defendants' counsel has not been able to quantify the number of emails produced; they are in the process of unitizing the eight pdfs they received, an extremely time-consuming process which likely will not be complete for several days.

Based on the material produced, there are obvious gaps. To begin with it appears the majority of materials produced are emails from Mr. Paatalo to Mr. Koeppel. There are some emails from Mr. Koeppel to Mr. Paatalo, but based on initial review, they represent a small portion of the total production. This suggests the review for production was not as broad as the Court ordered, since Mr. Koeppel must have sent unique emails to Mr. Paatalo and must have also communicated with individuals other than Mr. Paatalo about his mortgage, AMGAR/tender, his many litigations and foreclosure. We know Mr. Koeppel's bookkeeper is named Kaye Dreves, but there are few emails including her name, let alone direct communications between Mr. Koeppel and Ms. Dreves on relevant subjects. We know Mr. Koeppel is in a mortgage/real estate/AMGAR tender business with Mr. Paatalo called Rexnet. We now know another participant in this business is named Robert Steele. There do not appear to be many or perhaps any emails directly between

Mr. Koeppel and Mr. Steele. We know both an Ohio investor and a Montana investor were in negotiations to participate in the AMGAR strategy in the summer of 2023, but there are only a few emails with what appears to be the Ohio investor and none from the Montana investor. Finally, the production does not include any documents from 2024-2026.

These are the deficiencies Defendants have been able to identify over the short period of time they have had to review the production.

To the extent Plaintiffs propose to submit a categorical log, this would inconsistent with Docket 161.

Dated: May 4, 2026.

LAW OFFICES OF RONALD H. FRESHMAN

*/s/ Ronald H. Freshman*
RONALD H. FRESHMAN
Attorney for Plaintiffs
GARY M. KOEPPEL and EMMA K. KOEPPEL

Dated: May 4, 2026.

LONG & LEVIT LLP



JESSICA R. MACGREGOR
JOHN B. SULLIVAN
ABIGAIL W. HENDERSON
Attorneys for Defendants
STEVEN WILKER and TONKON TORP LLP

4925-3105-4248, v. 1